UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Revocable Living Trust of Stewart I. Mandel, *Morris Mandel, Trustee*, | Case No. 3:14-cv-2245 |
| Plaintiff | |
| v. | MEMORANDUM OPINION AND ORDER |
| Lake Erie Utilities Company, et al., | |
| Defendants | |

## I. INTRODUCTION

All Defendants move for summary judgment on all claims in this action. (Doc. No. 101 (Defendant David M. Buda); Doc. No. 102 (Defendant Burgundy Bay Association); Doc. No. 103 (Defendants Jeff Clark, Mike Cummings, Kay Dickerson, John Fargo, John Held, Mark Lawless, Charles Meck, and Jennifer Oetting); Doc. No. 104 (Defendant Lake Erie Utilities); & Doc. No. 105 (Defendants Robert Beach, Eric Halterman, Krissy Hart, Bill Lodermeier, Greg Meyers, and Rich O'Loughlin)). Plaintiff filed a memorandum in opposition to Defendants' motions. (Doc. No. 125). Defendants then filed replies in support of their motions for summary judgment. (Doc. No. 132 (Defendant David M. Buda); Doc. No. 133 (Defendants Burgundy Bay Association and Lake Erie Utilities); & Doc. No. 134 (Defendants Robert Beach, Jeff Clark, Mike Cummings, Kay Dickerson, John Fargo, Eric Halterman, Krissy Hart, John Held, Mark Lawless, Bill Lodermeier, Charles Meck, Greg Meyers, Rich O'Loughlin, and Jennifer Oetting)).

Additionally, Plaintiff filed a motion for partial summary judgment. (Doc. No. 121). Defendants collectively filed a memorandum in opposition to Plaintiff's motion, (Doc. No. 122), and Plaintiff replied, (Doc. No. 129).

Finally, there remains a partial motion for judgment on the pleadings as to Plaintiff's state-law tortious interference with contract claims. (Doc. No. 41; Doc. No. 46; & Doc. No. 65 at 15).

## II. BACKGROUND

As accurately stated by the Sixth District of Ohio Court of Appeals in review of a related action in the Ottawa County, Ohio Probate Court, the factual background of this case is as follows,

> …During his lifetime, Stewart I. Mandel purchased three contiguous parcels of land known as Lots 398, 399 and 400, in the Burgundy Bay subdivision on Middle Bass Island in Ottawa County, Ohio. A cottage sat on Lot 399 and the contiguous Lots 398 and 400 remained vacant. Appellant Burgundy Bay Association, Inc. ("BBA"), is a property owners association that maintains the roads and common areas within the subdivision. Appellant Lake Erie Utilities Co. ("LEU"), is a business that operates sewer and water facilities on Middle Bass Island and provides utility services to lots within the Burgundy Bay subdivision. All of the lots within the subdivision are subject to deed restrictions that are duly recorded in the records of Ottawa County. Those restrictions impose upon the owners of each lot, the obligation to pay certain fees to BBA and LEU on an annual basis for the operation and maintenance of water and sewer facilities owned by LEU and the roads, amenities and common areas owned by BBA.
> On October 7, 1991, Mandel signed a contiguous lot agreement ("the [CLA]") with BBA and LEU. The [CLA] was drafted by attorneys for BBA and LEU and was identical to contiguous lot agreements signed by numerous other property owners in the Burgundy Bay subdivision. The purpose of the [CLA] was set forth in the opening recital as follows:
>
>> WHEREAS, the BBA's Board of Trustees and LEU have determined that an owner of a vacant lot which is contiguous to Owner's lot upon which a residential structure is built (herein referred to as a "Residential Lot") should be exempt from BBA dues ("dues") and LEU availability for use charges ("charges") so long as both the Residential Lot and the Contiguous Lot are owned by Owner * * * and is vacant[.]
>
> The [CLA] then sets forth the following relevant provisions:
>
>> 2. WAIVER OF DUES AND FEES
>> In consideration of Owner agreeing not to construct a residence upon the Contiguous Lot, BBA and LEU agree to waive their dues and charges including any special assessments which may be assessed against members

2

of BBA or LEU otherwise chargeable to the Contiguous Lot or the Owner. By way of illustration, assessments for maintenance and repair of common areas are waived.

\* \* \*

4. CONSTRUCTION OF OTHER THAN ACCESSORY BUILDING
In the event Owner (i) construct a building on the Contiguous Lot which is not an extension or enlargement of the existing residence located on the Residential Lot; (ii) builds a garage or an out-building that is not an accessory structure to or compatible with the residence; or (iii) fails to comply with the Declarations of Restrictions or obtain, in advance, the required approvals of the BBAAC then this Agreement shall be void and Owner shall pay to BBA and LEU dues and charges and interest as provided in paragraph 5.

5. PAYMENT OF FEES UPON BREACH OR TERMINATION
In the event that Owner becomes liable to BBA or LEU to pay for dues and charges waived herein, then Owner shall pay BBA and LEU an amount equal to the dues and charges which would have otherwise been payable to BBA and LEU but for the existence of this Agreement, plus interest at the rate of Ten Percent (10%) per annum, calculated from the date the dues and charges would have otherwise been payable. Owner shall also pay to BBA and LEU reasonable attorney's fees and expenses and costs incurred by either BBA or LEU in the enforcement of this Agreement.

6. TERMINATION
Owner may terminate this Agreement by notifying BBA and LEU in writing of Owner's intention to so terminate. In that event, Owner shall pay to BBA and LEU an amount equal to the dues and charges that would have otherwise been payable to BBA and LEU but for the existence of this Agreement, plus interest at the rate of Ten Percent (10%) per annum, calculated from the date the dues and charges would have otherwise been payable.

\* \* \*

10. MISCELLANEOUS

\* \* \*

c. <u>Binding Effect.</u> This Agreement shall bind the parties hereto, their respective assigns, successors, receivers, and legal representatives of any type whatsoever, and shall not be modified unless done so in writing signed by the party sought to be bound by any such modification.

\* \* \*

> i. <u>Assignability.</u> Owner's rights and obligations hereunder may not be assigned without the prior written consent of both BBA and LEU, the granting of which consent shall be in BBA's and LEU's sole and absolute discretion.
>
> In 1996, Stewart Mandel established an inter vivos trust, appellee the Revocable Living Trust of Stewart I. Mandel, with himself as trustee. … Stewart Mandel then transferred Lots 398, 399 and 400 into the trust. Stewart Mandel died in February 2010, and Morris Mandel is the successor trustee of the trust. In August 2010, the trust entered into two separate agreements for the sale of the vacant contiguous lots, Lots 398 and 400. Upon learning of these impending sales, BBA and LEU advised the broker and title company handling the transactions that transfer of the lots to the prospective purchasers would constitute a breach of the [CLA] and would render the trust retroactively liable for all dues, fees, charges and assessments previously waived on Lots 398 and 400 since 1991, along with interest on those sums at a rate of 10 percent per year.

*See Revocable Living Trust of Mandel v. Lake Erie Utils. Co.*, 2016-Ohio-1396, 2016 WL 1291890, at *1-*2 (Ohio Ct. App. Mar. 31, 2016).

Rather than pay the amount demanded, Plaintiff brought a declaratory judgment action against Defendants asking the probate court to construe the parties' rights and obligations under the CLA.[1] Defendants asserted a counterclaim for breach of the CLA. Ultimately, the Ottawa County, Ohio Probate Court granted summary judgment to Plaintiff on all claims, including Defendants' counterclaim. In doing so, the court held that reasonable minds could only conclude that: (1) "sale of a contiguous lot [was] not a breach or termination of the CLA requiring payment of retroactive dues and charges; and (2) the CLA was "a 'waiver' agreement in that for so long as the owners/successors possess the residential lot and the contiguous lots and there is no prohibited construction or written intent to terminate, dues and charges owed to BBA and LEU are waived (or extinguished)." *Revocable Living Trust of Mandel v. Lake Erie Utilities Co.*, No. 20139003A (Ohio Prob Ct. Oct. 1, 2014) (provided as Doc. No. 51-1 at 9-10). The Sixth District of Ohio Court of Appeals

---

[1] After a series of proceedings in various state courts, the matter was eventually properly before the Ottawa County, Ohio Probate Court. *See Revocable Living Trust of Mandel v. Lake Erie Utils. Co.*, 2012-Ohio-2718, 2012 WL 6061326 (Ohio Ct. App. Dec. 6, 2012); *see also* (Doc. Nos. 101-3 & 101-5).

affirmed the decision. *See Revocable Living Trust of Mandel v. Lake Erie Utils. Co.*, 2016-Ohio-1396, 2016 WL 1291890 (Ohio Ct. App. Mar. 31, 2016).

After the Ottawa County Probate Court issued its decision, Plaintiff filed the present action asserting a civil Racketeer Influenced and Corruption Organizations Act ("RICO") claim and two claims of tortious interference with contract. (Doc. No. 1). I later granted Plaintiff the opportunity to amend the complaint to assert a RICO conspiracy claim.

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. DISCUSSION

As stated in the Introduction, Defendants move for summary judgment on all claims. Plaintiff moves for summary judgment as to the RICO-related claims alone.

### A. Civil RICO Claim

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Accordingly, to succeed

5

on this claim, Plaintiff must prove Defendants engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

**1.      Racketeering Activity**

In this case, Plaintiff claims Defendants committed the "racketeering activity" of mail fraud. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 454 (2006) (recognizing mail fraud as a racketeering activity); 18 U.S.C. § 1961(1)(B) (defining mail fraud as a racketeering activity). To establish mail fraud, Plaintiff must show Defendants: "devised a scheme to defraud, used the mails in furtherance of that scheme, and intended to deprive [Plaintiff] of money or property." *United States v. Petlechkov*, 922 F.3d 762, 766 (6th Cir. 2019) (citing 18 U.S.C. § 1341; *United States v. Warshak*, 631 F.3d 266, 310 (6th Cir. 2010)). The element of *scienter* can be established "by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 484 (6th Cir. 2013).

"A scheme to defraud includes any plan or course of action by which someone intends to … deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (internal quotation marks and quotation omitted). This is not a technical standard but "a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979) (quoting *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973) (further citation omitted)).

Plaintiff alleges Defendants engaged in a multi-part scheme to defraud. First, Plaintiff claims BBA, LEU, and Buda drafted the CLA in a manner which made "false promises" of waiver of dues and charges, while omitting material facts reflecting BBA and LEU's true intent under the CLA. This short-coming in drafting, Plaintiff asserts, was at least reckless if not intentional. The second and third facets of this scheme relate to BBA, LEU, and Buda's misinterpretation of the plain

language of the CLA and all Defendants' enforcement of this misinterpretation on both contiguous lot owners and Plaintiff.

i.  *Drafting of the CLA*

Defendants do not dispute that intentional omission of material facts would give rise to mail fraud but contend they did not act with the requisite intent to commit fraud. Instead, they assert the CLA was drafted by independent counsel, who failed to accurately express BBA and LEU's intent in the language of the CLA.

There is evidence that BBA and LEU originally intended the CLA to breach on transfer of the property to a new owner unless the new owner purchased both the contiguous and residential lots and agreed to the terms of the CLA. (Doc. No. 101-6 at 11, 14). Further, if the CLA was breached in this manner, BBA and LEU intended to collect liquidated damages in the form of retroactive dues and charges plus interest. (*Id.*). But, while this was communicated to Buda, who was to draft the CLA initially, the only evidence that this was communicated to the drafting attorney is the testimony of Buda himself. (Doc. No. 101-6 at 3).

Even though the agreement was drafted by independent counsel, the evidence indicates that Buda and Richard Plewacki, LEU President and Chairman at the time, both licensed attorneys, reviewed the independently-drafted CLA, knowing of BBA and LEU's intent. (Doc. No. 101-6 at 13-22). Although Plewacki made some edits to the first draft of the CLA, neither suggested changing the word "waive" to "defer" or adding language to convey that any unconditional transfer of property was a breach of the CLA resulting in the imposition of liquidated damages.

As held by the Ottawa County Probate Court and the Court of Appeals, reasonable minds could only conclude the CLA was a "waiver agreement" not a deferral agreement as purported by BBA and LEU and that sale of a contiguous lot did not result in breach of the CLA. *See Revocable Living Trust of Mandel v. Lake Erie Utils. Co.*, No. 20139003A (Ohio Prob Ct. Oct. 1, 2014) (provided

as Doc. No. 51-1), *aff'd Revocable Living Trust of Mandel v. Lake Erie Utils. Co.*, 2016-Ohio-1396, 2016 WL 1291890 (Ohio Ct. App. Mar. 31, 2016). If a reasonable person could not conclude BBA and LEU's interpretation was encompassed by the language of the CLA, it is difficult to believe not one, but two licensed attorneys failed to recognize this. Therefore, a reasonable jury could infer that omission of facts reflecting BBA and LEU's true intent was reckless or intentional.

Even considering this, the omission would not give rise to mail fraud if these facts were not material. *Petlechkov*, 922 F.3d at 766. That is, to constitute a scheme to defraud, the misrepresentation or omission must have had the ability to "influence the decision of a 'person [ ] of ordinary prudence and comprehension.'" *Id.* (quoting *United States v. Jamieson*, 427 F.3d 394, 415-16 (6th Cir. 2005)).

Under BBA and LEU's interpretation, contiguous lot owners like Stewart Mandel who signed the CLA were affirming that neither themselves, nor any one they might transfer the property to in the future would build on a contiguous lot. In exchange for this promise, BBA and LEU would "defer" the relatively minimal dues and charges otherwise payable by the signatory owner until the signatory owner transferred his multiple lots individually or transferred all of his lots to one person who was unwilling to assume the previous owners' retroactive dues and charges and keep the contiguous lot vacant. For this convenience of deferral, BBA and LEU would charge the signatory owner interest of ten percent per year on the deferred dues incurred over the signatories' ownership.

Essentially, by signing the CLA, contiguous lot owners were agreeing to these restraints on alienation or use of the property in consideration for a low-interest loan. This is an absurd result. At a basic level, it is bizarre that someone would practically forfeit these property rights. But, to do so in exchange for *deferral* of the minimal annual dues and charges, only to pay all of these deferred dues and charges with accrued interest at transfer – or death in Stewart Mandel's case – is senseless.

8

Therefore, since a person of ordinary prudence and comprehension would not have signed the CLA knowing BBA and LEU's intent, the omitted facts were material.

ii.     *Misinterpretation of the CLA as Drafted*

Even if Buda and Plewacki legitimately failed to recognize that the plain language of the CLA did not say what BBA and LEU thought it was going to say, there is evidence that they later tried to rectify this error by intentionally misinterpreting the CLA.

On October 19, 1993, LEU Vice President Louise J. Bierdeman mailed letters to two CLA-signatory owners– the Campbells and the Reeses. (Doc. No. 125-4). At the time, the Campbells had sold their property and the Reeses had informed BBA and LEU of their intention to sell. (*Id.* at 1, 3). Bierdeman advised both that a sale without assignment of the CLA to the new owners would "effectively terminate[ ]" the CLA. (*Id.* at 1, 3). This termination, in turn, would require them to pay "BBA and LEU an amount equal to the dues and charges that would have otherwise been payable" during their ownership of the property "plus interest at the rate of 10% annum calculated from the date the dues and charges would have otherwise been payable." (*Id.* at 1, 3).

Buda and Plewacki were each carbon copied on Bierdeman's letters. (*Id.* at 2, 4). One month after the letters were sent, Plewacki mailed Buda the following letter:

> In the event you have not been informed from other sources, I will provide you a brief update on both the Reese matter and the Campbell matter as they pertain to the Contiguous Lot Agreements.
>
> As I mentioned to you on the Island on October 31, the purchasers of the Reese properties (Lots 125 and 126) did not agree to an assignment of the Contiguous Lot Agreement. Accordingly, at closing both LEU and BBA were to receive the amount of charges set forth in Louise's letter of October 19. LEU did, in fact, receive its money, I'm not sure whether BBA received the amount due it.
>
> Enclosed is a copy of a letter dated November 12 from the Campbells regarding Louise's letter of October 19. [The] Campbells paid LEU the amount requested. I'm intrigued by the word choice of "the Burgundy Bay Association component will be forwarded <u>or otherwise managed</u> directly with that entity." You may care to check into what that phrase actually means for BBA purposes.

9

> On balance, it looks as though the approach that you and I hammered out as evidenced in Louise's 10/19 letter worked and established a meaningful precedent.

(Doc. No. 134-6) (underline in original).

Reading these letters together, a reasonable factfinder could conclude "the approach that [Buda and Plewacki] hammered out as evidence in Louise's 10/19 letter[s]" was an intentional misrepresentation of the plain language of the CLA crafted by Buda and Plewacki so that BBA and LEU could collect dues and charges with interest to which they were not entitled. The satisfaction that this "hammered out" "approach" had "worked and established a meaningful precedent" provides further evidence of the questionable motive of the "approach" and intent to make these same misrepresentations to future CLA-signatory owners for BBA and LEU's undue gain.

Defendants attempt to shift focus from these incriminatory phrases to the letter's reference to the option to assign the CLA to a new owner. But assignment would have required CLA-signatory owners to forfeit their property rights by finding a buyer who was willing to purchase both the residential and contiguous lots subject to these restraints *and* to assume the debts of the previous owner, all while accruing their own dues and charges which would grow at ten percent per year. A reasonable factfinder could not conclude this to be a realistic, let alone better, alternative.

iii.   *Enforcement and Concealment of Defendants' "Approach"*

Beyond the misrepresentation of the CLA itself, there is also evidence that BBA and LEU concealed their true intent until CLA-signatory owners like Mandel were vulnerable and likely to concede to BBA and LEU's demands.

Prior to Mandel's death, he received invoices from LEU which listed the dues owed on the property. For one lot, Lot 399, Mandel was charged the "full use" fee of either $200 or $225. (Doc. No. 131-3). But, for the two other lots, Lots 398 and 400, Mandel was charged $0.00. (*Id.*). The "description" of these zero-charges is "Contiguous Lot Agreement." (*Id.*). None of these invoices suggest the fees were merely "deferred" or provide any indication of the total amount of fees

10

"deferred" over his years of ownership.  Knowledge of the running balance of deferred dues, charges, and accrued interest would have influenced a person of ordinary prudence and comprehension to either pay the dues and charges before even more interest could accrue or at least account for this sum total when making decisions about disposal of the land at death or sale.  Therefore, a reasonable jury could infer that omission of this material fact was at least reckless, giving rise to mail fraud.

Rather than notify Mandel of these costs at any point during his ownership, Defendants waited.  It was only after Mandel died on February 22, 2010, and Plaintiff had agreed to sell the contiguous lots that Buda mailed a letter to Plaintiff on October 9, 2010, advising that a lien would be placed on the property if Plaintiff did not: (1) pay BBA and LEU the lump sums demanded; (2) sell the lots to one owner who would agree to assignment of the CLA; or (3) replat the three lots into one.  (Doc. No. 133-7).   This poor timing allowed Defendants to "hold [Plaintiff's] feet to the fire," as evident from the following exchange at the BBA Board meeting when discussing whether to require Plaintiff adhere to Defendants' demands:

> [Buda] – [Plaintiff] has two options.  1.  Sell all three lots to the same purchaser who would agree to continue with the contiguous lot program or 2.  Pay up.  Given the fact we have so many lots in the contiguous lot program, it becomes a major economic issue for Burgundy Bay and L.E.U, and there can be no give in the equation.
>
> Question – "If they sell it off as one piece, is the new owner responsible for the past dues, water, etc.?"
>
> Dave [Buda] – "If they can find a buyer who can agree to that deal, then that would take care of the problem.  They could combine the lots into one but our practice is that when that happens, that mitigates the agreement and we don't hold their 'feet to the fire' for any past dues."
>
> [John] Fargo – "If you compromise, it becomes a precedence, it's not like it is going to happen only one time.  When I had the one conversation with Eric, he wasn't sure whether retroactively it wiped out the obligation.["]
>
> Mark [L]awless – "We can't budge on this.  If you remember a few years ago, Deszcz's were upset that they had to pay, which included compounded interest, but

11

they paid it.  If we back off on this we will be in deep trouble.  We have to hold their 'feet to the fire.'"

(Doc. No. 121-1 at 3).  From this exchange, a reasonable jury could conclude Defendants' recognized the implausibility of their interpretation but continued to enforce it against Plaintiff, who had already agreed to sell the contiguous lots to other owners.

It was not the first time BBA and LEU chose to enforce the CLA this way to the detriment of a vulnerable contiguous lot owner.  As discussed above, the Reeses and the Campbells were notified of Buda and Plewacki's "hammered out" "approach" only when they sought to sell their property as well.  (Doc. No. 125-4).  Further, the BBA Board minutes state that the "Deszcz's were [also] upset that they had to pay, which included compounded interest, but they paid it."  (Doc. No. 121-1 at 3).

Despite knowing other CLA-signatory owners were upset about having to pay the retroactive dues and charges demanded at the eleventh hour, BBA and LEU still failed to notify existing CLA holders of the consequences of sale or transfer of property.  Instead, they stayed silent, omitted these accumulating costs that would likely be payable from dues invoices, and continued to provide these no-win options to those wishing to immediately transfer their property.

This enforcement policy was clearly central to BBA and LEU's operation as BBA would be in "deep trouble" if it made an exception for Plaintiff as it would cause "a major economic issue for Burgundy Bay and L.E.U." (*Id.*).  From this, a reasonable jury could conclude Defendants intentionally omitted the running balance from invoices and failed to inform CLA-signatories, like Mandel, of their enforcement policy in order to deprive people, like Plaintiff, of money or property.

*iv.     Green Space*

In the face of the evidence described above, Defendants maintain their interpretation and enforcement thereof was not unreasonable but achieved the CLA's alleged purpose of preserving green space.  In doing so, they argue that the two options given to Plaintiff to avoid directly paying

12

the demand served the purpose of maintaining green space by ensuring the contiguous lots remained vacant. These options were to sell all lots to one owner who would agree to assignment of the CLA or replat the three lots into one. While either of these options would preserve green space by having only one residence on three lots and there is evidence that green space was a purpose of the CLA, (Doc. No. 102-8), there is also evidence that the actual concern was "green" rather than green space.

At the time Plaintiff was selling its contiguous lots, BBA and LEU were also trying to sell their own lots. While Plaintiff was charging $17,000 per lot, (Doc. No. 121-1 at 2), Defendants were charging approximately $45,000, (Doc. No. 136 at 104). In other words, Plaintiff and Defendant were in direct competition with one another, and Plaintiff was offering a better deal. By suggesting Plaintiff replat its property from three lots to one, Defendants were not merely maintaining green space but effectively eliminating competition. Due to the circumstances at the time, this inevitable consequence could reasonably be interpreted as an ulterior motive.

*v.*     *Use of Mail*

"To be part of the execution of the fraud, … the use of the mails need not be an essential element of the scheme. *Pereira v. United States,* 347 U.S. 1, 8 [ ] (1954). It is sufficient for the mailing to be 'incident to an essential part of the scheme,' *ibid.,* or 'a step in [the] plot, *Badders v. United States,* 240 U.S. 391, 394 [ ] (1916)." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989).

In this case, the mail was used several times in furtherance of the alleged scheme. The first was the 1993 letters sent by Bierdeman and Plewacki. (Doc. Nos. 125-4 & 134-6). Next was the sending of the 2010 letter from Buda to Plaintiff informing Plaintiff of the threat of a property lien if Plaintiff did not pay Defendants the retroactive costs, assign the CLA to one new owner, or replat the three lots into one. (Doc. No. 133-7). And finally, the invoices that were sent to Stewart Mandel that omitted all reference to deferral of dues or charges or accumulation thereof. (Doc. No. 121-3). These mailings fulfill the "mail" element of the racketeering activity of mail fraud.

13

*vi.  Conclusion*

A reasonable factfinder could conclude Defendants engaged in racketeering activity through the drafting, "misinterpretation," and enforcement of the CLA.  But the evidence must also be viewed in the light most favorable to Defendants.

The one fact that is especially perplexing here is that both Plewacki and Buda's life partner, Carol Schneider, each signed a CLA.  (Doc. No. 101-1 at 1).  This is crucial since Buda was instrumental at every step of this alleged scheme and Plewacki for most.  Because each were, in some way, willing to subject themselves to the arguably egregious conditions, a reasonable jury could find they did not act with intent to defraud by imposing conditions they agreed to themselves.

Accordingly, a fact issue remains as to whether Defendants engaged in racketeering activity.

**2. Enterprise**

The definition of an "enterprise" under RICO "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The "wide reach" of this definition encompasses not only business-like entities, but also "'a group of persons associated together for a common purpose of engaging in a course of conduct.'"  *Boyle v. United States*, 556 U.S. 938, 944-45 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  Ultimately, the "enterprise" element "'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'"  *Boyle*, 556 at 945 (quoting *Turkette*, 452 U.S. at 583).

In this case, Defendants admit LEU and BBA are Ohio corporations governed by an elected board of trustees.  (Doc. No. 79 at ¶¶ 3, 4; Doc. No. 80 at ¶¶ 3, 4).  Individual Defendants David Buda, John Fargo, Jeff Clark, Mike Cummings, Mark Lawless, Charles Meck, Kay Dickerson, John Held, and Jennifer Oetting were members of the BBA Board, and Greg Myers, Rich O'Loughlin,

14

Krissy Hart, Eric Halterman, Robert Beach, and William Lodermeier were LEU Board members. (Doc. No. 136 at 150). Both groups conducted Board meetings. (Doc. Nos. 102-8, 121-1, & 136). And both not only collaborated on the CLA program itself, but also owned property jointly. (Doc. No. 136 at 154). Accordingly, a reasonable jury could only conclude Defendants were part of an enterprise.

Defendants do not meaningfully dispute this other than to allege that because "the State of Ohio occupies three seats on the LEU board," it is a governmental entity without the ability to possess the requisite criminal intent. (Doc. No. 122 at 17). But, while the State of Ohio is permitted to seat up to three board members, all three seats are not occupied. (Doc. No. 109 at 32). Further, even if the State of Ohio were to fill all three allotted seats, it would still make up only a third of the nine-member board. (*Id.* at 29). Finally, the State of Ohio was only given these seats in 2012, years after: (1) the CLA was drafted in or around 1991; (2) LEU adopted its "hammered out" "approach" in 1993; and (3) LEU attempted to enforce it against Plaintiff in 2010. (*Id.* at 32). As such, LEU will not be excluded from liability as a governmental entity.

### 3. Conduct

To be liable under § 1962(c), Defendants must have "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original). Because this element requires only that Defendants had "*some* part in directing the enterprise's affairs," *id.* at 179 (emphasis in original), it may be satisfied by showing Defendants "either [ ] ma[de] decisions on behalf of the enterprise or [ ] knowingly carr[ied] them out." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 792 (6th Cir. 2012) (quoting *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008)) (emphasis omitted).

Here, the evidence discussed above suggests Buda participated in the enterprise's affairs from the inception of the scheme through the state litigation attempting to enforce he and

15

Plewacki's "hammered out" "approach" on Plaintiff.  Regarding BBA Board members, the exchange at the BBA Board meeting discussed above evinces John Fargo and Mark Lawless's active participation in directing BBA to enforce the CLA on Plaintiff.  (Doc. No. 121-1 at 3).  Further, there is evidence that while on the BBA Board, Jeff Clark, Charles Meck, and Jennifer Oetting did nothing to try to terminate the litigation against Plaintiff or stop enforcement of the CLA against anyone else.  (Doc. No. 112 at 46; Doc. No. 114 at 39; Doc. No. 115 at 21).  Finally, as testified by William Lodermeier, during his tenure on the LEU Board from 2013-2016, no one, including himself, moved to terminate the litigation against Plaintiff.  (Doc. No. 110 at 47-48).  These other board members included Greg Myers, Rich O'Loughlin, Krissy Hart, Eric Halterman, Mike Cummings, and Robert Beach.  (Doc. No. 136 at 147-54).

As such, there is sufficient evidence to satisfy the "conduct" element with respect to these individual Defendants at this stage in the litigation.  But since Plaintiff cites no record evidence of any "conduct" by Kay Dickerson and John Held, they must be dismissed from this action.

**4.     Pattern**

To assess whether Defendants engaged in a "pattern" of racketeering activity, the court applies the "relationship plus continuity" test.  *Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F. 3d 393, 409 (6th Cir. 2012) (citation omitted).  That is, Plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original).

Plaintiff can prove the "relationship" prong of the test by showing that the acts of racketeering activity have "similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (further citation omitted).  In this case, BBA and LEU enforced their misinterpretation of the CLA on multiple Owners in a similar manner, as evident by the similar

letters sent to the Campbells, the Reeses, and Plaintiff. (Doc. Nos. 125-4 & Doc. No. 133-7). In fact, it was the letters sent to the Reeses and the Campbells that "established a meaningful precedent." (Doc. No. 134-6). "Given the fact [that there were] so many lots in the contiguous lot program," this precedent could not be disrupted since "it [would] become[ ] a major economic issue for Burgundy Bay and L.E.U." (Doc. No. 121-1 at 3).

As such, Defendants enforced their misinterpretation against Plaintiff just as they had done to the Deszczs before. (*Id.*). From this evidence, a reasonable jury could conclude there was a relationship between Defendants' racketeering activities.

The "continuity" prong can be established by showing "either [ ] a closed period of repeated conduct, or [ ] past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. "[T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* at 242. This way of doing business need not be the business of "organized crime," but also includes the "regular way of conducting defendant's ongoing legitimate business." *Id.* at 243.

As discussed above, there is evidence that enforcement of the CLAs was a regular occurrence for BBA and LEU beginning in 1993 through at least 2016 when the state litigation ceased. Both BBA and LEU depended upon the revenue from these collected back dues, with BBA characterizing the break in precedent of enforcement as a threat of "a major economic issue for Burgundy Bay and L.E.U." (Doc. No. 121-1 at 3). As such, while there is no evidence to indicate how the remaining CLAs were terminated after the 2016 ruling, Defendants' "misinterpretation" and enforcement efforts continued through repeated acts over a "substantial period of time." *H.J. Inc.*, 492 U.S. at 242. Accordingly, there is sufficient evidence to establish both the "relationship" and "continuity" prongs of the "pattern" element.

## B. Civil RICO Conspiracy

In addition to Plaintiff's claim that Defendants violated RICO's civil prohibition of § 1962(c), Plaintiff also claims Defendants conspired to violate § 1962(c), in violation of § 1962(d). To establish this claim, Plaintiff must show Defendants "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997); *see also United States v. Rios*, 830 F.3d 403, 424 (6th Cir. 2016). As discussed above, other than Defendants Kay Dickerson and John Held, there is sufficient evidence to suggest that all Defendants adopted the goal of enforcement of the CLA. But a question remains as to not only the substance of the offense itself, but also whether the individual Defendants merely endorsed the goal or actually adopted it. Therefore, summary judgment may not be granted to either side.

## C. Tortious Interference with Contract

Ohio law recognizes the tort of tortious interference with contract. *Kenty v. Transam. Premium Ins. Co.*, 72 Ohio St. 3d 415, 418 (1995). This tort occurs in a business setting when "a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14 (1995).

Plaintiff asserts Defendants tortuously interfered with two contracts for the sale of Contiguous Lots 398 and 400. (Doc. No. 79 at 20). Defendants moved for summary judgment alleging the claim is grounded not in a tort, but instead a breach of contract. But no contract was breached here. Instead, BBA and LEU misinterpreted the CLA and attempted to enforce this misinterpretation. These actions, which were intended to result in collection of fees, dues, interest, and ultimately attorney fees to which they were not entitled, is grounds for a claim of fraud – a tort. As such, this claim may not be dismissed as easily as Defendants suggest.

Instead, to survive summary judgment, Plaintiff must set forth sufficient evidence of the following elements:

> (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.

*Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 176 (1999) (citing *Kenty*, 72 Ohio St. 3d at 419). Undisputed are the first two elements – the two contracts cited by Plaintiff did exist and Defendant knew of their existence. The final three elements remain in dispute.

Upon learning of Plaintiff's two contracts, there is no dispute that Defendants sent Plaintiff a letter informing Plaintiff of its "options" to avoid having a lien placed upon the property. (Doc. No. 133-7). As discussed above, these options were not based on the language of the CLA itself and were entirely unreasonable in practice, which supports an inference that the Defendants' actions lacked justification. Because Plaintiff was unwilling to succumb to Defendants' unfounded demands, the contracts for sale of the contiguous lots were terminated, resulting in damages. From these facts, a reasonable jury could find Defendants liable of tortious interference with contract. Therefore, Defendants are denied summary judgment on these claims.

## V. CONCLUSION

For the foregoing reasons, Defendants Kay Dickerson and John Held are granted summary judgment and are dismissed as Defendants in this action. (Doc. No. 103). Plaintiff and the remaining Defendants' motions for summary judgment are denied. (Doc. Nos. 101, 102, 103, 104, 105, & 121). Additionally, in light of the motion for summary judgment on the state-law claims, the pending motion for judgment on the pleadings on these claims is denied as moot. (Doc. Nos. 41, 46, 65).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
